IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09cr336-1 |
| | ) | |
| SHAWN MICHAEL CLARK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Before the court is Defendant Shawn Michael Clark's motion for compassionate release from incarceration pursuant to the First Step Act of 2018. (Doc. 81.) The Government filed a response, opposing release. (Doc. 83.) Clark filed a reply (Doc. 84) as well as supplemental briefs. (Docs. 82, 86.) For the reasons set forth below, Clark's motion will be denied.

## I. BACKGROUND

On December 10, 2010, Clark pleaded guilty to three counts of trafficking for labor and services by force, fraud or coercion in violation of 18 U.S.C. § 1590 and three counts of trafficking minors to engage in commercial sex acts by force, fraud or coercion, in violation of 18 U.S.C. § 1591. (Doc. 50.) He was sentenced to 360 months of imprisonment and 25 years of supervised release. (Id.) His convictions and sentence were affirmed on appeal. United States v. Clark, 442 F. App'x 774, 775 (4th Cir.

2011) (per curiam). Clark is presently detained at FMC Rochester in Minnesota. (Doc. 81 ¶ 1.) He represents that, with good time credit, he has a scheduled release date of July 11, 2035. (Id. ¶ 2.) At age 46, he has served 145 months, or just over 40%, of his 360-month sentence. (Id.)

Clark's presentence investigation report noted that as early as 2006, when Clark had begun his offense conduct, he had been diagnosed with congestive heart failure and type 2 diabetes-uncontrolled, which led to a series of hospital emergency department visits beginning December 2006. (Doc. 85 ¶ 103; Doc. 60 at 86-87.) He also suffered from chronic asthma, as he had his entire life. (Doc. 85 ¶ 103.) Nevertheless, despite these debilitating conditions, Clark persisted in his offense conduct.

By September 2019, Bureau of Prisons ("BOP") physicians determined that Clark's congestive heart failure had become severe, and Clark continued to suffer from a host of other medical issues, including asthma, type 2 diabetes, and "[s]evere restrictive lung disease." (Doc. 81-1 at 1.) He was given a "quite poor" prognosis and a high likelihood of dying within 18 months. (Id. at 2.) He was largely either bedridden or ambulatory with an electric wheelchair. (Id.; Doc. 81 ¶ 3.)[1]

---

[1] Doctors noted, however, that Clark was still able to operate independently as to his activities of daily living ("ADL") and instrumental activities of daily living ("IADL"). (Doc. 81-1 at 3.)

Clark filed a request for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A), with the Warden of FMC Rochester in Minnesota where he is housed. The Warden approved the request and forwarded it to the BOP Central Office for approval on September 11, 2019. (Doc. 81-1 at 4.) However, on November 19, 2019, the BOP General Counsel denied the request. (Id. at 5-6.) Although BOP agreed that Clark suffered from a terminal medical condition, it determined that the "nature and circumstances of [his] offense, his probation violations, and his disciplinary history . . . would minimize the severity of his offense and pose a danger to the community." (Id. at 6.)

A BOP medical report from January 2020 notes that Clark's condition has worsened, giving him an "extremely poor prognosis" and indicating that he is on a 24-hour infusion treatment and IV heart medication to maintain his heart rhythm. In addition to his worsening condition, he has developed chronic kidney disease.

Clark filed the present motion for compassionate release on March 23, 2020. (Doc. 81.) He argues, through counsel, that his terminal illness has placed him on an end-of-life trajectory and that he meets all relevant criteria to be considered for compassionate release under 18 U.S.C. § 3582(c)(1)(A). According to Clark, the Warden of FMC Rochester correctly allowed his request for compassionate release to proceed, while BOP's denial is "callous" and "preposterous." (Id. ¶ 11.) Clark also contends he

3

is particularly vulnerable to the ongoing novel coronavirus ("COVID-19") pandemic, thus providing further justification for his compassionate release. (<u>Id.</u> ¶¶ 13-14.) If released, he proposes to live with an ex-wife in Henderson, North Carolina. (Doc. 82 ¶ 1.) He reports that a probation officer in the Eastern District of North Carolina visited his ex-wife and approved her residence as a placement should he be released. (<u>Id.</u> ¶ 2.)

The Government opposes release. It does not dispute that Clark's congestive heart failure constitutes a terminal condition meeting the standard for early release, but it argues that the sentencing factors that a court must consider weigh against release.

## II. ANALYSIS

### A. Standard of Review and Exhaustion

"Federal law has long authorized courts to reduce sentences of federal prisoners facing extraordinary health conditions," but prior to the passage of the First Step Act of 2018, district courts could grant such reductions only upon a motion by the Director of Bureau of Prisons under 18 U.S.C. § 3582(c)(1). <u>United States v. Beck</u>, 1:13-cr-186-6, 2019 WL 2716505, at *4 (M.D.N.C. June 28, 2019). However, Congress amended § 3582(c)(1) when it passed the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194. Pertinent here, the First Step Act added a provision to § 3582(c)(1) that allows a defendant to bring a motion for compassionate release

4

directly in a district court after either "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

Once this exhaustion requirement is met, a defendant must either (1) have "extraordinary and compelling reasons" for a compassionate release, or (2) be at least 70 years old, have served 30 years in prison, and have the Director of Bureau of Prisons determine that the defendant is not a danger to the public. Id. Additionally, a court, in considering a reduction in sentence pursuant to § 3582(c)(1)(A), must consult the sentencing factors set forth in 18 U.S.C. § 3553(a) and may grant the reduction only if it is "consistent with [the] applicable policy statements" issued by the United States Sentencing Commission. Id. This includes United States Sentencing Guideline § 1B1.13. Section 1B1.13 essentially reiterates the requirements of § 3582(c)(1)(A), with the additional requirement that a defendant not be "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2); see also Beck, 2019 WL 2716505, at *4. The application notes to § 1B1.13 provide examples of extraordinary and compelling reasons to grant a compassionate release, including when an inmate is suffering from a debilitating medical condition

5

that has "substantially diminishe[d] the ability of the [inmate] to provide self-care within the environment of a correctional facility and from which he . . .is not expected to recover." U.S.S.G. § 1B1.13 application note 1(A)(ii).

For over a year, the Sentencing Commission has lacked a quorum and thus has not updated its policy statements on compassionate release since the First Step Act was signed into law in December 2018. Beck, 2019 WL 2716505, at *5 n.7. Thus, the current phrasing of § 1B1.13 addresses scenarios in which the BOP Director files a motion for compassionate release, but not situations in which an inmate files a similar motion under § 3582. As such, § 1B1.13 provides helpful guidance when considering a motion filed by an inmate, but "it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." Beck, 2019 WL 2716505, at *6. Therefore, when considering the merits of an inmate's § 3582(c)(1)(A) motion for compassionate release, the court must consider the § 3553(a) factors but is not limited by the policy statements outlined in § 1B1.13. See id.

The Government concedes, and the court finds, that Clark has exhausted his administrative remedies as required by § 3582(c)(1)(A) following BOP's rejection of his request for a reduction in sentence. Furthermore, the court finds, as the Government also concedes, that Clark's medical condition

6

constitutes an "extraordinary and compelling reason[]" to warrant a reduction in sentence. 18 U.S.C. § 3582(c)(1)(A)(i). The application notes of § 1B1.13 state that "extraordinary and compelling" circumstances exist when an inmate is suffering from "a serious and advanced illness with an end of life trajectory." U.S.S.G. § 1B1.13, application note 1(A)(i). Additionally, a BOP program statement notes that a reduction in sentence consideration "may be given to inmates who have been diagnosed with a terminal, incurable disease and whose life expectancy is eighteen (18) months or less, and/or has a disease or condition with an end-of-life trajectory under 18 USC § 3582(d)(1)." BOP Program Statement 5050.50, "Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)," at 4 (Jan. 17, 2019). The BOP physicians' September 2019 prognosis that Clark had roughly 18 months to live, as well as their January 2020 update, noting that his condition has worsened such that he requires nearly constant medical attention, clearly puts Clark on an "end-of-life" trajectory due to a terminal medical condition. Thus, extraordinary and compelling circumstances exist to consider Clark's motion for compassionate release.

**B. Consideration of the § 3553(a) Factors**

The Government notes that compassionate release is discretionary and opposes Clark's motion based on a consideration of the § 3553(a) factors that this court is required to consider.

7

(Doc. 83 at 9.) The Government points to the nature and circumstances of Clark's offenses, in addition to his criminal history and personal characteristics, as weighing against compassionate release. (Id. at 9-11.) In the Government's view, Clark's sentence -- 360 months -- was lenient and compassionate release would minimize the severity of his offenses. (Id. at 11.) Clark largely sidesteps the Government's arguments, acknowledging simply that this was "a serious" and "dreadful case." (Doc. 84 at 1.) But he contends that there is "every good reason to grant the pending motion expeditiously, and truly no good reason not to." (Doc. 81 ¶ 11).

Section 3553(a) requires a court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). The court must consider --

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care,

8

or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established for [the applicable offense category as set forth in the guidelines] . . . ;

(5) any pertinent policy statement . . . by the Sentencing Commission . . . ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Id. As detailed below, these factors weigh strongly against Clark's release.

To say that the offense conduct was "dreadful," is an understatement. Callous, heinous, malevolent, malicious, indeed evil, might be more accurate. According to the presentence report, which the court adopted as findings of fact at sentencing, Clark engaged in a calculated, persistent, and brutally-enforced sex-trafficking scheme for his personal profit and perverse pleasure. What's more, he engaged in this conduct following a significant criminal history and while on probation for other felony convictions. (Doc. 85 ¶¶ 74, 80.)[2] It would be a grievous

---

[2] Clark's presentence report shows a lengthy history of criminal offenses leading up the crimes here, including robbery with a handgun, felony eluding arrest, and felony escape from state prison. (Doc. 85 ¶¶ 60-87.)

disservice to the administration of justice and to the victims to gloss over the horrific facts of this case.

Clark first recruited J.J., a 15-year-old, in 2006. He told her he was 21 years old, even though he was approximately 32. (Doc. 85 ¶ 7.) J.J. was doing well in high school and living with her grandmother. (Doc. 60 at 53.) Clark groomed her with gifts and plied her with alcohol, had sex with her four or five times, and began prostituting her to other men. (Doc. 85 ¶ 7.) He introduced her to marijuana and nitrous oxide and transported her out of state on multiple occasions "for commercial sex acts." (Id.) He posted her contact information on the website Craigslist for sexual activity, which led to regular sex acts with men. J.J. estimated that she had "60 sexual encounters per week" while she was with Clark. (Id. ¶ 8.) Clark also took her out of state more than 20 times for prostitution. (Doc. 60 at 56.)

J.J.'s mother, after becoming concerned about her minor daughter's welfare, eventually traced her daughter to a hotel where Clark kept her. When the mother knocked on the door of the hotel room, Clark held a gun to J.J.'s head, cocked it, and told J.J. he would shoot if she said anything, thus preventing her release. (Doc. 85 ¶ 7.)

Not only did Clark prostitute J.J., he involved her in schemes to rob the men who came to pay for sexual favors. During these robberies, Clark would hold a gun on the victims while the women

10

robbed them. (Doc. 60 at 57-58.) This led to J.J.'s conviction on several robbery charges and sentence of 38-55 months of imprisonment. (Doc. 85 ¶ 8.) Clark prostituted J.J. until around March 9, 2008. (Id.)

As a result of Clark's offenses, J.J. became fearful of all men and no longer wanted to be around people. (Id. ¶ 19.) She told probation officers that she wished Clark would have killed her instead of forcing her to go through with his demands, and that she had experienced sleep loss, depression, and repeated flashbacks of the painful memories of her time with him such that she sought out counseling and mental health treatment. (Id.)

Clark met S.C., a 16-year-old female, in 2008. (Id. ¶ 9.) He knew she was only 16, and thus a minor; by now he was 34 years old. (Id.) At the time, she was a straight A student but taking medication for depression. (Doc. 60 at 13-14, 24-25.) However, Clark soon posted her picture on Craigslist without her knowledge, plied her with Xanax, cocaine, and pills to keep her compliant, and had men meet with her for sex at various motels, apartments, and places he controlled. (Id. at 13; Doc. 85 ¶ 9.) She became dependent on the drugs Clark provided and estimated that she had between 50 and 70 sexual encounters with other men during the time she was with Clark. (Doc. 60 at 14; Doc. 85 ¶ 9.)

Clark enforced his will on S.C. with deep cruelty. When she talked back to him or refused to follow his orders, Clark

11

physically assaulted her, "routinely us[ing] 'drop cords' and a glass ashtray to beat her when the drugs wore off." (Doc 85 ¶ 9.) The assaults were so severe that two required treatment at the hospital. (<u>Id.</u> ¶ 9.) On one of those occasions, Clark beat her with a tire iron, which cracked her ribs and dislocated her shoulder. (<u>Id.</u>) On another occasion, she was vomiting blood. (Doc. 60 at 15.) Clark kicked her in the stomach and in the head, causing black and blue bruises and a welt all over her back. (<u>Id.</u> at 17.) S.C. tried to leave Clark and returned to her aunt's house. But Clark confronted her there, threatening her aunt and her aunt's children. (Doc. 85 ¶ 9.) Clark threatened to blow up her aunt's car if she ever got in it, and S.C. was aware that he kept firearms in his car. (Doc. 60 at 18-19.) Clark also found her when she tried to run away to her grandparents. (<u>Id.</u> at 20.) S.C. determined that if she left, he would kill her. (<u>Id.</u>) Out of fear for herself and her family, she returned to work for Clark. (Doc. 85 ¶ 9.)

Clark met C.T., another 16-year-old female, in February 2008. He initially took photos of her, some nude, after giving her money and marijuana. (Doc. 60 at 39.) He gave her ecstasy and marijuana, a place to live, offered her more money, and became involved with her. (Doc. 85 ¶ 10.) He performed oral sex on her and took nude pictures of her to post to Craigslist as an advertisement for his prostitution ring. (<u>Id.</u>) While she participated in Clark's scheme

12

for less than one month, she had multiple sexual encounters with at least four men known to Clark.  (Id.)[3]

In March 2008, C.T. ran away to Richmond, Virginia, with S.B., Clark's "main girl." (Id.)  In retaliation, Clark assaulted C.T. by hitting her in the head with the butt of a gun that looked like an AK-47 so hard that her family took her to the hospital for treatment.  (Id.)[4]  At the time of sentencing, C.T. still had a permanent scar and a lazy eye as a result.  (Id.; Doc. 60 at 46-47.)  In his effort to find her, Clark went with a gun to the home of C.T.'s mother, threatening to "shoot up everything." (Doc. 60 at 45.)  He further pursued C.T. to her cousin's house and put a gun to her nephews and niece to force them inside to look for C.T. (Id.)

S.B. met Clark when she was 17 years old and in and out of group homes.  (Doc. 85 ¶ 58.)  Clark offered her a place to stay but quickly got her involved in his prostitution ring.  As with the others, he beat her, causing a "busted nose," black eyes, "busted lips," and bruises.  (Doc. 60 at 30.)  He punched her in the chest and threatened her with a 9 mm handgun.  (Id. at 30-31.)

---

[3] On one occasion, Clark involved her in a scheme where he busted into a room with a shotgun where a nude customer had paid for sex but had not yet engaged with Clark's prostitute, scaring off the customer.  (Doc. 60 at 40-41.)  At the time of sentencing, C.T. was serving a sentence for prostitution-based robbery, to which Clark had introduced her.  (Id. at 42.)

[4] At sentencing, C.T. described it as a "sawed-off shotgun, a rifle-type gun." (Doc. 60 at 46.)

S.B. sold the gun because he had threatened to kill her. (Id. at 31.) She, too, tried to leave many times, only to have Clark find her. S.B. estimated she was beaten over 40 times with his fists and a drop cord. (Doc. 85 ¶ 58.) Other witnesses interviewed by the probation office indicated that S.B. was beaten with a beer bottle and brass knuckles. (Id.) J.J. testified that she witnessed Clark beat S.B. and saw him beat C.T. with the butt of the rifle until she was bloody. (Doc. 60 at 55-56.) At the time of sentencing and as a result of her experience, S.B. was taking medication for depression and sleep. (Id. at 28-35.)

On July 7, 2008, law enforcement officers located Clark in a hotel room with others with marijuana, firearms, and ammunition after having received an anonymous tip about narcotics, prostitution, and firearm activity in the hotel. (Doc. 85 ¶ 11.) Clark initially identified himself using the Virginia driver's license of one of the male customers he had robbed who came for sex with one of Clark's women. (Id.) Also present was a male middle school teacher whom Clark had hired to serve as a driver for his prostitution ring. (Id.) An underage female recruited by Clark was also arrested, but she refused to cooperate with the police. (Id. ¶ 12.) Law enforcement seized an Airsoft gun resembling an AK-47, a .45 caliber handgun, 19 rounds of .380 ammunition, a laptop computer, and lists of Craigslist account names and passwords. (Id.)

14

Clark was charged in state court with misdemeanor drug offenses as well as felony possession of a firearm, but he was released on bond. (Id. ¶ 13.)

Within twelve days, on July 19, Clark was back pursuing his sex trafficking activities. After undercover police arranged a commercial sex act by searching for a phone number associated with Clark, he was arrested again near where the sex act was to have taken place. (Id. ¶ 17.) Clark was driving a car with one of the women involved; a victim, S.C., was 16 years old. (Id. ¶ 15.) A computer seized from Clark contained nude images of underaged females. (Id. ¶ 17.) After being advised of his Miranda rights, Clark admitted that he used Craigslist for prostituting multiple girls to make money. (Id.)

With these facts in mind, it should come as no surprise that the court is concerned with the need for the sentence to reflect the seriousness of the offenses, to provide just punishment, and to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(A), (B). These factors weigh heavily against Clark. The seriousness of the offenses is made plain by the mere rendition of the offense conduct and the recommended Guideline range for imprisonment of 360 months to life. (Doc. 85 ¶ 118.) So far, Clark has served just over 40% of a low-end sentence and is not scheduled to be released until 2035. Release now, despite his medical conditions, would not reflect the gravity of his offenses.

15

Indeed, Clark cites no case in which a defendant who committed a violent offense or a sexual crime involving a minor was released pursuant to § 3582(c)(1)(A) before serving at least half of the sentence imposed. Moreover, as noted above, Clark's criminal conduct was persistent, undeterred by his then-probationary status, subsequent arrest on state charges, and posting of bail, and his violence was deeply disturbing and unrelenting.

In considering whether it would be "just" to continue incarceration given Clark's current medical condition, two points are worth noting. First, the offense conduct alone warrants a strong punishment. Second, it is not as if Clark had no forewarning; unlike many other applications for early release, Clark <u>knew</u> he had congestive heart failure, asthma, and diabetes <u>before</u> he committed the instant offenses. His conditions were serious then; they led to intermittent hospital visits as early as 2006. Yet, Clark chose to engage in the extensive offense conduct for nearly two years.

Without addressing the severity of his offense conduct, Clark argues that his release would not pose a public threat because he does not "have any interest whatever in criminal activity" as he is dying and, although "[t]here was violence in his past . . . he is certainly incapable of it now." (Doc. 84 at 1-2.) Both the need for deterrence and protection of the public are implicated by this statement. <u>See</u> 18 U.S.C. § 3553(a)(2)(B) and (C). The court

16

accepts that the likelihood that Clark would return to his sex trafficking is relatively low insofar as he is weak and largely wheelchair-bound. But to be sure, he has "presented no post-sentencing mitigation evidence" to rebut the facts demonstrating his propensity for violence and manipulation of underaged women. United States v. Webster, No. 3:91CR138 (DJN), 2020 WL 618828, at *6 (E.D. Va. Feb. 10, 2020). It is also notable that nowhere in the multiple filings in support of his motion (Docs. 81, 82, 84, and 86) does he express remorse for his actions or for the permanent scars -- both emotional and physical -- he has inflicted on his victims.[5] Even if Clark will be deterred from further criminal activity, the court considers general deterrence, which weighs against release at this stage.

Wholly apart from these reasons, Clark's release plan fails to pass muster. Through counsel, he represents that he plans to live with an ex-wife in Roxboro, North Carolina. (Doc. 82 ¶ 7.) According to the presentence report, he married this ex-wife in 2001 and the marriage was annulled that same year. (Doc. 85 ¶ 97.) It is not clear that she would be a suitable third-party host. She has a "lengthy criminal record" for "mostly fraud-type offenses" and at the time of Clark's sentencing was serving a

---

[5] The Government has been unable to locate or contact the victims of Clark's crimes to provide their views regarding Clark's motion. (Doc. 83 at 10 n.3.)

sentence in the North Carolina Department of Corrections for felony obtaining property by false pretenses and a probation violation. (Id.) There is also no evidence that Clark has maintained close relations with her to support the inference that she is aware of and committed to the work necessary to support him in his declining health. While Clark had two children with her, he saw them only "a couple times a month" before his arrest, perhaps attributable to the fact that he had eleven other children with seven other women, including one woman who worked for him as a prostitute. (Doc. 85 ¶¶ 97-99.) He subsequently married one of these women in 2007, even though he continued to engage in the underlying offense conduct in this case, and had two children with her. (Id. ¶ 99.)[6]

In addition, though Clark's motion represents that his ex-wife lives in a residence in Roxboro, the probation office reports that she has since moved into a two-bedroom, one-bathroom residence in Henderson, North Carolina that she shares with a female friend and, approximately three days a week, that woman's toddler-aged granddaughter. This presents significant concerns. Should Clark be released, he would have to register as a sex offender and would be living in a home with a minor child. (Doc. 50 at 4.) It is also far from clear where Clark would reside within the residence given his significant medical needs and the fact that both bedrooms

_____

[6] Because he is not proposing to live with this woman as part of his release plan, it appears that this marriage is no longer viable.

are currently occupied.  More concerning, Clark's ex-wife told probation officers she was unaware of the extent of Clark's convictions.  In addition, because both she and the friend work full-time, no one else would be present at the residence during her working hours, leaving Clark unsupervised and unattended.

Clark cites several compassionate release cases he contends are similar.[7]  (Doc. 81 at 4.)  However, he fails to address, much less explain, how the facts of those cases support his motion.  In fact, the cases are readily distinguishable, principally because they largely involve non-violent offenders.  In contrast, Clark

---

[7] See United States v. Gray, 416 F. Supp. 3d 784, 786 (S.D. Ind. 2019) (defendant found guilty of conspiracy to possess with intent to distribute methamphetamine); Beck, 2019 WL 2716505, at *1 (defendant pled guilty to conspiracy to distribute methamphetamine and had received insufficient medical attention for her rapidly spreading cancer); United States v. Peterson, No. 7:12-cr-15-1BO, 2019 U.S. Dist. LEXIS 93480, at *1-2 (E.D.N.C. June 4, 2019) (80-year-old wheelchair-bound defendant convicted of possession with intent to distribute cocaine base and discharge of a firearm in furtherance of a drug trafficking offense); United States v. Bakowski, No. 8:09-cr-491-T-33, slip op. at 1 (M.D. Fla. May 21, 2019) (defendant convicted of making a false statement to a financial institution); United States v. McGraw, No. 2:02-cr-00018, 2019 WL 2059488, at *2 (S.D. Ind. May 9, 2019) (defendant found guilty for conspiracy to possess with intent to distribute methamphetamine and had served 17 years); United States v. Leggitt, No. 4:12-cr-306-06, slip op. at 1 (E.D. Ark. May 6, 2019) (defendant convicted of conspiracy to distribute methamphetamine); United States v. Adams, No. 4:09-cr-115-O, (N.D. Tex. May 3, 2019); United States v. Brittner, No. 9:16-cr-00015, 2019 U.S. Dist. LEXIS 73653, at *1 (D. Mont. May 1, 2019) (defendant pleaded guilty to distribution of methamphetamine); United States v. Garcia, No. 2:11-cr-00935-R-6, slip op. at 3 (C.D. Cal. Mar. 22, 2019) (defendant had served over half of his prison term for a "felony drug offense"); United States v. Evans, No. 4:15-CR-15-2 (S.D. Tex. March 13, 2019).  A number of these decisions are unpublished.  Clark, however, failed to provide copies of them as required by this court's Local Rules. See L.R. 7.2(c).  Although the court is therefore not required to consider them, it nevertheless has located and read the cases in considering Clark's motion.

exploited vulnerable girls, many underage, plied them with drugs, and violently threatened and assaulted them regularly to ensure compliance. Cf. United States v. Chambliss, 948 F.3d 691, 693-94 (5th Cir. 2020) (affirming a district court's denial of a compassionate release motion of a defendant who had been sentenced to 30 years imprisonment for trafficking methamphetamine and had a criminal history that demonstrated a clear disregard for the rule of law); United States v. Hahn, Case No. 08-95, 2020 WL 980185, at *3 (D. Minn. Feb. 28, 2020) (denying compassionate release motion of a defendant whose offense conduct "involved the rape of a 12-year-old girl" and the production of child pornography); Webster, 2020 WL 618828, at *6-7 (denying compassionate release motion of defendant who had killed his paramour in cold-blood); United States v. Gotti, 02 CR 743-07 (CM), 2020 WL 497987, at *2-3 (S.D.N.Y. Jan. 15, 2020) (denying compassionate release motion in the alternative because defendant had been the "Acting Boss of the Gambino Crime Family" and had directed the murder of a former mob member).

The gravity of Clark's health situation is not lost on the court. But balancing all the § 3553(a) factors, the court in its discretion concludes that Clark has failed to demonstrate that they weigh in favor of his request for compassionate release. At the very time he was busy committing his heinous crimes -- a period of well over a year and a half -- and while he was suffering from

20

the very ailments he now cites as the cause of his declining health, Clark nevertheless persisted in violently and brutally trafficking in forced labor and committing sex crimes with minors without any remorse or compassion for his victims. Early release under these conditions is not warranted.

### C. COVID-19

Clark further argues that the ongoing COVID-19 pandemic supports his compassionate release, since his deteriorating medical condition makes him particularly vulnerable to the virus. Indeed, "the COVID-19 outbreak is unprecedented and poses a heightened risk to those in this nation's prisons and jails." United States v. Carver, No. 4:19-cr-06044-SMJ, 2020 WL 1604968, at *1 (E.D. Wash. Apr. 1, 2020). With that risk in mind, "the Attorney General has directed the Bureau of Prisons, when assessing compassionate release applications, to prioritize the transfer of incarcerated inmates to home confinement 'where appropriate' to decrease the risks to their health."[8] United States v. Resnick, 14 CR 810 (CM), 2020 WL 1651508, at *5 (S.D.N.Y. Apr. 2, 2020) (quoting Memorandum for Director of Bureau Prisons from the

---

[8] Clark also relies upon another memorandum from the Attorney General to BOP regarding the release of prisoners due to COVID-19. (Doc. 86-2.) However, the memorandum is explicitly addressed to federal facilities that are currently "experiencing significant levels of [COVID-19] infection." (Id. at 1.) The memorandum identifies these institutions "and other similarly situated BOP facilities," but FMC Rochester, where Clark is housed, is not one of them. (Id.) Thus, the memorandum does not support Clark's argument.

21

Attorney General, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (March 26, 2020), accessed at https://www.justice.gov/file/1262731/download). Although "it is prudent to consider the factors that the Attorney General finds to be important," the memo "has no binding force on the Judiciary." *Id.* Many of the factors identified by the Attorney General are similar to the factors in 18 U.S.C. § 3553(a) and U.S.S.G. § 1B1.13 that the court has already considered here.

Although the Attorney General has encouraged BOP to move vulnerable inmates to home confinement, and Clark's medical conditions likely make him more vulnerable to COVID-19 should he contract it, those facts do not persuade the court that his motion should be granted at this time. For one, Clark overlooks that the Attorney General has emphasized that, when BOP considers moving an inmate to home confinement, the inmate's crime of conviction should be taken into consideration, and further notes that an inmate who has committed a sex offense "should weigh more heavily against consideration for home detention." Memorandum for Director of Bureau Prisons from the Attorney General, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (March 26, 2020), accessed at https://www.justice.gov/file/1262731/download. Clark would fall under this category.

22

Furthermore, as the Government emphasizes, as of this time FMC Rochester has not reported a single case of COVID-19, and BOP has taken many steps to protect its staff and inmates from the virus. For example, all incoming inmates and BOP staff are screened for COVID-19 symptoms -- asymptomatic inmates who are at risk of exposure will be quarantined for 14 days. (Doc. 83 at 12.) Only essential service contractors are allowed to enter BOP facilities, and they are subject to the same screening procedures as incoming BOP inmates and staff. (Id.) All social and legal visits have been suspended to limit exposure to the virus (id. at 12-13) and, as of April 1, inmates in all BOP facilities have been secured in their assigned quarters for 14 days to decrease the spread of COVID-19. (Id. at 13).

The premise of Clark's motion is that he would be better protected from the COVID-19 virus at his ex-wife's residence than within the confines of the BOP. But this is far from clear, and perhaps not even likely. The probation office reports that Clark's ex-wife is employed in the health care field, which indicates that she will be exposed daily to others outside the residence. Moreover, there are two other residents of the proposed placement, including a youth who will be in and out of the residence three days or so per week. This presents a significant health risk to Clark during this period of social distancing. In contrast, the BOP has adopted several rigid rules to protect Clark from exposure

to the virus. The situation is no doubt fluid. Therefore, while Clark's motion on this ground is denied, it is denied without prejudice to his renewing it should there be an outbreak in a BOP facility where he is housed that poses a particularized threat to his health.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Clark's motion for compassionate release (Doc. 81) is DENIED without prejudice.


                                     /s/    Thomas D. Schroeder
                                     United States District Judge

April 15, 2020